UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                        Case No. 2:10-cr-21-02

v.                                       HON. ROBERT HOLMES BELL

SCOTT EDWARD SIPPOLA,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Scott Edward Sippola is charged as a co-defendant with Allison Lenore Coss in a three-count indictment with one count of conspiracy to extort money by use of interstate communications, in violation of 18 U.S.C. §§ 371 and 875(d), and two counts of interstate transmission of a threat to injure the reputation of another to extort money, in violation of 18 U.S.C. §§ 2(a) and 875(d). On April 23, 2010, defendant Sippola filed a Motion to Suppress and Brief in Support of Motion to Suppress (Docket # 13), seeking to suppress custodial statements made on the day of his arrest, December 2, 2009. The government filed a response on May 25, 2010 (Docket #23). An evidentiary hearing was held on June 1, 2010, and continued on June 10, 2010. Testifying at the hearing were Detective Jeffrey Erickson, Detective Joe Bonovetz, Detective Sergeant Ronald Koski, Detective Mark Hanes, FBI Special Agent Jay Johnston, and FBI Special Agent David Kowalski.

On December 2, 2009, the day of the arrest, an undercover FBI agent posing as a personal representative of the alleged victim received four telephone calls from a man named

"Brian L." The agent and "Brian L" discussed a location near the K. I. Sawyer International Airport in Marquette County, Michigan, where the agent could drop the money requested in the alleged extortion. The final telephone call placed by "Brian L" began at 2:35 p.m. and lasted approximately three minutes. At this time, officers of the Upper Peninsula Substance Enforcement Team (UPSET) observed two people, a man and a woman, occupying a vehicle known to be owned by Sippola. At the direction of the FBI, UPSET officers made contact with the occupants of the vehicle and discovered that defendants Sippola and Coss were the occupants. Sippola, posing as "Brian L," was in the midst of a telephone call with the undercover FBI agent. Sippola and Coss were then arrested by UPSET officers.

The UPSET officers who testified at the hearing were all present at the time of the arrest and described the arrest as follows. The arrest occurred in a vacant parking lot on the grounds of what was formerly the K. I. Sawyer Air Force Base in Marquette County. While there was some disagreement among the UPSET officers about the exact makes and models of the vehicles they drove on the day of the arrest, they all testified that the vehicles used during the arrest were not marked as police vehicles. The testimony also showed that none of the officers were wearing the police uniform of their respective agencies (the various detectives assigned to UPSET were members of the Escanaba Public Safety Department, the Michigan State Police and the City of Marquette Police Department, among others), or police clothing in general. Each UPSET officer on the scene wore civilian clothes and a badge suspended from a chain around the neck. Some of the officers wore ball caps that had the word "POLICE" printed on the front.

The arrest began when Detectives Bonovetz and Hanes recognized Sippola's vehicle, a custom pick-up truck with a license plate that read "SKYBOXX," which was a vehicle that

Bonovetz knew from experience belonged to Sippola. Bonovetz drove his vehicle, a silver, unmarked Chevrolet Malibu, into the parking lot where the truck was located, and placed it nose to nose with the truck. Bonovetz and Hanes exited their vehicle and ran to Sippola's truck, yelling "STATE POLICE" and gesturing for the occupants to exit. The truck began to move in reverse, causing Bonovetz to bang on the truck with his hand and demand Sippola to stop. Another unmarked police vehicle pulled in behind the truck to completely block its movement. The UPSET detectives approached the truck with weapons drawn and attempted to open the doors, but the truck was locked. Approximately 15 seconds later, the doors were unlocked and Sippola and Coss were physically removed from the truck by Bonovetz and Hanes. Bonovetz and Hanes placed defendants on the ground, face down. Shortly after defendants were placed on the ground, both were handcuffed behind their backs. Bonovetz placed his knee in defendant Sippola's back in order to keep him restrained on the ground. Detective Sergeant Koski then asked Detective Erickson to read Sippola his *Miranda* rights.

Detective Erickson testified that he read a *Miranda* warning to Sippola from a preprinted card (Government's Exhibit 1), and that Sippola answered "No" when Detective Erickson read the portion of the card that said, "Are you willing to give up these rights and answer my questions at this time?" Testimony indicates that within moments, FBI Special Agent Johnston arrived at the scene and took control of the arrest. Erickson brought Sippola to his feet and walked him approximately 50 feet to Johnston's car. Erickson told Agent Johnston that Erickson had read defendant Sippola his rights and that Sippola had indicated he did not want to talk with Erickson. At the car, Johnston changed Sippola's restraints and placed Sippola in the front passenger seat of the car. Another FBI Special Agent, David Kowalski, got into the vehicle immediately behind

Sippola. Johnston got into the driver's seat of the vehicle. Erickson spoke with Special Agent Johnston for about two minutes after the arrest and before Johnston questioned Sippola. After FBI Special Agent Johnston entered the vehicle, he began reviewing the FBI Advice of Rights form with defendant Sippola. Johnston felt that Sippola's assertion of his rights and refusal to speak was not a "clear and intelligent" assertion of his rights because Sippola was under stress and did not know who the arresting agency was. Johnston placed the date and time that he began reading the rights, indicating that he began reading those rights at 2:42 p.m. on December 2, 2009. According to Johnston, the defendant was read the rights and waived those rights at approximately 2:43 p.m. on December 2, 2009. See Government's Exhibit 2. Johnston indicated he did not look at his watch when he put 2:42 p.m. at the top of the Advice of Rights form. After reviewing the telephone records and determining that the arrest was made at 2:37 p.m., Johnston changed the Advice of Rights form to indicate that he began reading the rights at 2:44 p.m., not 2:42 p.m. Johnston indicated he never looked at a watch and that the time recorded on the form was his best estimate.

The following is a summarization of the timing of the events at issue in this motion. Sippola was arrested at 2:37 or 2:38 p.m. Moments after the arrest, the FBI appeared on the scene. Prior to the FBI appearing on the scene, Sippola was read his rights by Detective Erickson. Approximately a minute or two later, Johnston appeared on the scene, making the time 2:39 or 2:40 p.m. Sippola was walked 50 feet to the FBI vehicle and Detective Erickson indicated that he spoke with Special Agent Johnston for about two minutes. Thereafter, Johnston entered the vehicle with Special Agent Kowalski. After entering the vehicle, Johnston read defendant Sippola his rights. From the initial arrest to Johnston's advice of rights, five to seven minutes elapsed. Accordingly,

it is likely that less than five minutes elapsed from the time that Sippola asserted his rights to the time that Johnston sought a waiver.

The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." *Id.* at 444. In *Michigan v. Mosley*, 423 U.S. 96 (1975), the court addressed the question presented in the present motion to suppress regarding when questioning may be resumed after an individual has invoked his or her rights. The Supreme Court explained:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.

*Id.* at 102. The Court went on to explain:

> [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 104.

In *Mosley* the Court laid out several factors which should be considered in determining whether or not the right to cut off questioning was scrupulously honored. These factors include the amount of time that elapsed between the interrogation, the scope of the second

interrogation, whether new *Miranda* warnings were given to the suspect, and the degree to which police officers pursued interrogation once the suspect had invoked his right to remain silent. *Id*. at 104-105. *Mosley* does not require that a fixed length of time pass before a fresh set of *Miranda* warnings can be given. *See Fleming v. Metrish*, 556 F.3d 520, 530 (6th Cir. 2009).

In the recent Supreme Court case of *Berghuis v. Thompkins*, ___ S.Ct. ___, 2010 WL 2160784 (June 1, 2010), the Court explained that a suspect's assertion of his *Miranda* rights must be unambiguous and unequivocal. The Court went on to explain, "If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." Slip Opinion at page 16. Defendant Sippola's assertion of his *Miranda* rights in this case was unequivocal. He was asked the question, "Are you willing to give up these rights and answer my questions at this time?" and he responded, "No." At that point, further interrogation was impermissible.

In *VanHook v. Anderson*, 488 F.3d 411 (6th Cir. 2007), the Court was confronted with a question related to the assertion of the right to counsel. The Court explained:

> The rule of *Edwards*-a suspect who is in custody and has asked for a lawyer must not be subject to further interrogation until a lawyer has been provided or unless the suspect initiates a discussion-is "a corollary to *Miranda's* admonition that if the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Arizona v. Roberson,* 486 U.S. 675, 680, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (internal quotation marks and brackets omitted). It "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis,* 512 U.S. at 458, 114 S.Ct. 2350 (internal quotation marks omitted). "In the absence of such a bright-line prohibition, the authorities through 'badgering' or 'overreaching'-explicit or subtle, deliberate or unintentional-might otherwise wear down the accused and persuade him to incriminate himself." *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (internal quotation marks and

> brackets omitted); *see also North Carolina v. Butler,* 441 U.S. 369, 374, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("Without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."). Moreover, the rule provides "clear and unequivocal guidelines to the law enforcement profession," *Roberson,* 486 U.S. at 682, 108 S.Ct. 2093, and "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness," *Minnick v. Mississippi,* 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

*Id*. at 415-416.

In *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004), the Court explained:

> Whatever else *Mosley* might require, it is clear that some break in the interrogation must occur. *See Mosley,* 423 U.S. at 102, 96 S.Ct. 321 (concluding that once the right to silence has been invoked allowing the resumption of an interrogation after only a momentary break would "lead to absurd and unintended results"). Thus, we conclude that Moran failed to scrupulously honor Rambo's right to remain silent and, therefore, Rambo's confession must be suppressed.

*Id.* at 911.

In the case of *United States v. Stewart*, 51 F.2d 1136 (D. Kan. 1999), the Court held reinterrogation of a suspect after assertion of the right to remain silent after the passage of 20 minutes violated *Mosley*. The Court explained:

> In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court addressed whether the issue of whether a resumption of questioning is permissible where a person in custody has invoked his right to remain silent. *Id.* at 101, 96 S.Ct. 321. The Supreme Court concluded that the resolution of this issue was governed by the following passage from *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 100, 96 S.Ct. 321 ( *quoting Miranda,* 384 U.S. at 473-74, 86 S.Ct. at 1627). Further questioning of a defendant who has invoked his right

> to remain silent is only permissible if law enforcement officers "scrupulously honor" the defendant's assertion of the right to remain silent. *Id.* at 104, 96 S.Ct. 321 ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'"). "To determine whether a suspect's right to cut off questioning was 'scrupulously honored,' *Mosley* established a multi-factor test that includes an inquiry into the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *United States v. Schwensow,* 151 F.3d 650, 658 (7th Cir.1998) (*citing Mosley,* 423 at 104-05, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313), *cert. denied,* 525 U.S. 1059, 119 S.Ct. 626, 142 L.Ed.2d 565 (1998).

*Id.* at 1141.

In the opinion of the undersigned, the present case requires the Court to review the totality of circumstances surrounding the decision to reinterrogate defendant Sippola after his assertion of his rights. As counsel for the government indicated, the arrest was "dynamic." Defendant was boxed in by two vehicles and several plainclothes law enforcement officers approached with guns drawn. Defendant Sippola was physically and forcefully removed from the vehicle, placed face down on the ground, and held down with a knee in his back by a gun toting law enforcement officer. Defendant Sippola was undoubtedly under a great deal of stress at this time. The testimony of the law enforcement officers was that it was apparent that defendant Sippola was under significant stress. Shortly after the arrest was made, Sippola was read his rights and responded that he did not want to waive those rights. Thereafter, defendant was brought to his feet and taken to an FBI vehicle. At some point before entering the FBI vehicle, defendant Sippola's restraints were changed from back restraints to forward restraints, which would allow him to sit in the vehicle. Defendant Sippola was then placed in an FBI vehicle with an FBI agent sitting immediately behind

him, who he could not see. Agent Johnston then entered the vehicle and immediately began the process of seeking to interrogate Sippola and secure a waiver of his rights. The atmosphere in the vehicle was undoubtedly very stressful for Sippola. He was now alone in a vehicle with two FBI agents he did not know. He had just been arrested at gunpoint and thrown to the ground. After having been advised of his rights, and deciding that he did not want to waive those rights, he was again asked to waive those rights. There was no appreciable passage of time between Sippola's assertion of his rights and the attempt by Special Agent Johnston to reinterrogate Sippola. In fact, it was part of one sequence of events. Agent Johnston did not seek to honor defendant Sippola's assertion of his rights. In fact, Agent Johnston's testimony indicates that it was his opinion that Sippola's assertion of his rights was not clear and informed, despite the fact that Agent Johnston knew Sippola had been read his rights and had stated "No" when asked if he was willing to waive those rights.

The government relies on the case of *United States v. Hsu*, 852 F.2d 407 (9th Cir. 1988), in support of its assertion that the motion to suppress should be denied. In that case, immediately after the arrest, an agent read the defendant his *Miranda* rights from a preprinted card and the defendant waived his rights. After answering some questions, Hsu asked if he could remain silent and the agent immediately stopped questioning him. Defendant was then placed in a car and driven to his co-conspirator's nearby home, which was being searched. Another law enforcement officer approached the defendant. This law enforcement officer was unaware that defendant had invoked his right to remain silent and advised the defendant of his *Miranda* rights. The defendant waived his rights and confessed to the crime during interrogation. Under these circumstances, the Court denied the motion to suppress. The facts of the current case are clearly distinguishable from

*United States v. Hsu*. In *Hsu*, almost 30 minutes had passed between assertion of the rights and the second interrogation. Furthermore, the circumstances of the arrest were not similar to those presented in the instant case. Unlike *Hsu*, the instant case involved a "dynamic" arrest at gunpoint. Physical force was used to arrest Sippola and he was immediately placed in restraints.

> In *United States v. Hsu*, the Court explained:
>
> In *Michigan v. Mosley,* the Supreme Court rejected the proposition that its earlier decision in *Miranda* barred law enforcement officials from ever questioning a suspect after the suspect had invoked his right to remain silent. Rather than adopt such a fixed, per se rule, the *Mosley* Court laid down a case-by-case approach that takes the concerns of the *Miranda* Court into account. In adopting the "scrupulously honored" rule, the *Mosley* Court recognized that police questioning is especially suspect when it follows a suspect's invocation of his *Miranda* rights, and consequently, courts must be satisfied that any statements made in response to such questioning were the products of the suspect's free will.
>
> * * *
>
> *Mosley* envisioned an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. Among the factors to which the Court looked in that case were the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence. *See Mosley*, 423 U.S. at 104-06, 96 S.Ct. at 326-27. At no time, however, did the Court suggest that these factors were exhaustive, nor did it imply that a finding as to one of the enumerated factors-such as, for example, a finding that only a short period of time had elapsed-would forestall the more general inquiry into whether, in view of all relevant circumstances, the police "scrupulously honored" the right to cut off questioning.

*Id.* at 409-410.

> In *Charles v. Smith*, 894 F2d 718 (5th Cir. 1990), the Court explained:
>
>> When a suspect does not request counsel, but only halts police interrogation by asserting the right to remain silent, if an inculpatory statement is elicited in later questioning, the court must examine the record in each case to determine whether the police "scrupulously honored" the detainee's right to cut off questioning. This case-by-case treatment can produce opposite results in cases that are similar in some respects. Compare *United States v. Hernandez*, 574 F.2d 1362 (5th Cir.1978) (*Miranda* violation) with *Kelly v. Lynaugh,* 862 F.2d 1126 (5th Cir.1988) (no *Miranda* violation).
>
>> In the present case the officer asked the two questions just a few minutes after Charles had declined for the second time to give a statement, not hours later as in *Mosley* and *Lynaugh*. Further, the same officer questioned Charles about the same crime that he had refused to discuss a short time before. Larpenter testified that he used "psychology" on Charles in asking about a hat and coat, hoping to get an admission. We do not believe, under these circumstances, that Larpenter "scrupulously honored" Charles' right to remain silent. Thus, as the district court found, the state trial court committed constitutional error on admitting testimony of the questions and Charles' responses.

*Id*. at 725-726.

The testimony at the hearing leads me to conclude that Special Agent Johnston did not scrupulously honor defendant Sippola's right to cut off questioning. Johnston testified that he felt the assertion of rights by Sippola was not clear and intelligent. There is no support for this assertion in the record.

In evaluating the totality of the circumstances, defendant Sippola was under a great deal of stress. Immediately after asserting his *Miranda* rights, he was turned over to the custody of FBI Special Agent Johnston, who instead of honoring Sippola's assertion of rights took steps to convince Sippola that he should waive those rights. Johnston's testimony indicated that he felt Sippola needed to know who the arresting agency was and the nature of the charges as well as the

overwhelming evidence they had against Sippola before he could intelligently waive his rights. Far from scrupulously honoring Sippola's rights, Agent Johnston's efforts were aimed at getting Sippola to waive his rights.

Accordingly, it is respectfully recommended that defendant Sippola's Motion to Suppress (Docket #13) be granted.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within 14 days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3. Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: June 24, 2010